26 F.3d 787
 146 L.R.R.M. (BNA) 2553, 128 Lab.Cas. P 11,115
 BROTHERHOOD OF LOCOMOTIVE ENGINEERS; H.L. Smith; G.D.
McLaughlin; L.D. Wilson, Appellants,
v.
The KANSAS CITY SOUTHERN RAILWAY COMPANY; Louisiana &
Arkansas Railway Company; United Transportation
Union, Appellees.
 No. 93-2944.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1994.
Decided May 26, 1994.
 
 Harold A. Ross, Cleveland, OH, argued (Stephen Douglas Bonney, on the brief), for appellants.
 Norton N. Newborn, Cleveland, OH, argued (Daniel Sawyer, on the brief), for appellees.
 Before BOWMAN and WOLLMAN, Circuit Judges, and ALSOP,* Senior District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 The Brotherhood of Locomotive Engineers and three individuals (collectively, BLE) brought suit against the Kansas City Southern Railway Company (KCS) and the United Transportation Union (UTU) seeking declaratory and injunctive relief under the Railway Labor Act (RLA), 45 U.S.C. Secs. 151-188 (1988), to invalidate and to enjoin enforcement of a side letter to the labor agreement between UTU and KCS, an agreement to which BLE was not a party. The District Court[1] granted summary judgment for KCS and UTU, and BLE appeals. We affirm.
 
 
 2
 BLE is a railroad union and the recognized bargaining representative for KCS's locomotive engineers.[2] UTU likewise is a railroad union, the authorized bargaining unit for KCS employees who are members of what is known in the industry as the "train service" craft: conductors, brakemen, and switchmen. Both unions thus have collective bargaining agreements with KCS, and both of those agreements contain "union shop" provisions. Under Sec. 2 Eleventh of the RLA, a union and a railroad may enter into an agreement that requires all employees in certain crafts to join the union within sixty days of employment. 45 U.S.C. Sec. 152 Eleventh (a). This is known as a union shop or union security agreement. Congress added Sec. 2 Eleventh, the union shop provision, to the RLA in 1951 so that all employees would be compelled to share in the costs of union representation. Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, 466 U.S. 435, 446, 104 S.Ct. 1883, 1891, 80 L.Ed.2d 428 (1984).
 
 
 3
 The seasonal nature of some railroad work and the consequent mobility of operating employees among the crafts, most especially between engine service and train service, makes union shop obligations in the railroad industry more onerous than they are in other industries. See Dempsey v. Atchison, Topeka & Santa Fe Ry., 16 F.3d 832, 837 (7th Cir.1994). As the need for engineers increases, railroads draw new engineers from train service. When fewer engine service positions are available, junior engineers are bumped back to train service. Thus union shop obligations present railroad operating employees with a Hobson's choice: either "belong to two unions--one representing each of his crafts--or ... shuttle between unions as he shuttles between jobs. The former alternative would, of course, be expensive and sometimes impossible, while the latter would be complicated and might mean loss of seniority and union benefits." Pennsylvania R.R. v. Rychlik, 352 U.S. 480, 490, 77 S.Ct. 421, 426, 1 L.Ed.2d 480 (1957). Congress therefore modified the RLA's union shop provision to the extent that those employees in the operating crafts may satisfy a union shop obligation by membership in any national labor organization that represents the carrier's operating employees, is organized under the RLA, and is qualified as an elector of the union representatives on the National Railroad Adjustment Board. 45 U.S.C. Sec. 152 Eleventh (c); Rychlik, 352 U.S. at 485, 77 S.Ct. at 423. Thus, a train service employee promoted to engineer, possibly involuntarily and often temporarily, need not give up his UTU membership and join BLE in order to meet his union shop obligation. Likewise, a junior engineer bumped back to train service as the need for engineers wanes may maintain his membership in BLE, assuming he has joined that union, and thus satisfy the union shop requirement. Any employee is free to resign membership in one union and join any other for which he is eligible. The employee may maintain multiple memberships, but he cannot be required to do so.
 
 
 4
 Beginning in 1988 and through 1991, BLE, UTU, and KCS were involved in nationwide negotiations made necessary when the railroads sought to reduce the number of workers on each train. On May 3, 1990, with the issue unresolved, President George Bush created Presidential Emergency Board 219 (PEB 219) to investigate the disputes upon which the parties were unable to reach agreement and to report its findings. On January 15, 1991, PEB 219 issued recommendations that the individual parties negotiate (rather than continuing with futile nationwide negotiation), to be followed by binding arbitration in the cases where negotiation at the local or regional level failed. Many of the parties then reached agreement. KCS and UTU were not among them.
 
 
 5
 In view of the important national interest in maintaining essential transportation services, Congress voted to impose the recommendations of PEB 219 upon those parties with unresolved issues, as though the parties themselves had agreed to those recommendations. Settlement of Railroad Labor-Management Disputes, Pub.L. No. 102-29, 105 Stat. 169 (1991). UTU and KCS went to arbitration and finally reached a new "crew consist" agreement, i.e., an agreement concerning reduction in crew size. Side Letter No. 3, the focal point of contention in this case, was a part of the final arbitration package. That letter agreement requires those train service employees transferring to engine service to continue paying dues to UTU if (but only if) they wish to continue to accrue train service seniority. Failure to pay UTU dues freezes the employee's train service seniority at the level it was when he moved to engine service, but does not reduce train service seniority already earned during his tenure with KCS. The practical effect, then, of a train service employee's failure to pay dues to UTU after transfer to engine service is that junior engineers who are laid off in engine service when engineer positions are cut back may find themselves unable to return to train service if they have been bypassed in seniority by more junior employees who have less continuous service with KCS overall but more accumulated train service seniority as a UTU member.
 
 
 6
 The text of Side Letter No. 3,[3] as reproduced in Appellants' Appendix, is as follows:
 
 Dear Sirs:
 
 7
 In view of the changes set forth in this Award concerning the existing Crew Consist Agreement, the following will apply to future train service employees transferring to engine service:
 
 
 8
 Effective with the date of this Award, train service employees transferring to engine service will have their train service seniority placed in leave of absence status and will continue to accumulate such seniority. This will apply to the period of time that such employees are required to protect their engine service seniority. Full dues to the UTU will be required while maintaining and accumulating train service seniority under the revised Crew Consist Agreement as set forth in the Award. The Carrier is instructed to advise the UTU General Chairman in writing, when train service employees are transferred to engine service.
 
 
 9
 BLE argues that Side Letter No. 3 and the manner in which it was negotiated (that is, without giving BLE the opportunity to be included in the negotiations) violate various provisions of the RLA. Because judgment was granted on a motion for summary judgment, we review de novo, and will affirm if we determine there are no genuine issues of material fact and that judgment as a matter of law is appropriate. Scheideman v. West Des Moines Community Sch. Dist., 989 F.2d 286, 288 (8th Cir.1993). We find it helpful to our discussion to address BLE's arguments in the reverse of the order presented to this Court in the briefs.
 
 I.
 
 10
 BLE claims that, under the RLA, it was entitled to notice and an opportunity to participate in the arbitration and negotiation between UTU and KCS where the side letter agreement was reached. Although BLE's brief does not refer this Court to the statutory authority for the notice and right to participate to which it claims to be entitled, the union apparently is relying upon Sec. 6 of the RLA, which provides in pertinent part:
 
 
 11
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice....
 
 
 12
 45 U.S.C. Sec. 156 (emphasis added).
 
 
 13
 In spite of a fair amount of discussion in the briefs, there apparently is no dispute that Side Letter No. 3 is an "agreement[ ] affecting rates of pay, rules, or working conditions."[4] Looking to the nature of the dispute out of which Side Letter No. 3 arose, the crew consist arbitration arguably was intended to result in changes affecting UTU's agreement with KCS concerning rules or working conditions. The question remains whether BLE was a "part[y] interested in such changes" within the meaning of the RLA, as UTU and KCS clearly were, such that it was entitled to notice. We hold that it was not.
 
 
 14
 We cannot deny that BLE was "interested" in the ultimate result of the arbitration; this lawsuit is clear evidence of that. But we do not think that Congress intended mere interest in the subject or outcome of a dispute to require that a union be given statutory notice of, much less a right to participate in, negotiations or arbitration between another union and the employer. The distinctive division of railroad employees under the RLA into crafts or classes, and the regular movement of employees among the crafts that is characteristic of the industry, portends overlapping "interests" among bargaining units in the composition of the crafts and in their labor agreements. That sort of interest, however, does not confer upon all unions the right to notice and participation in the arbitrations of all other unions. "An analysis of the bargaining process refutes the idea that the 'parties interested in such intended changes' would or could include all those persons who might be affected by the changes or the unions of which they were members." Order of Ry. Conductors & Brakemen v. Switchmen's Union, 269 F.2d 726, 732 (5th Cir.), cert. denied, 361 U.S. 899, 80 S.Ct. 206, 4 L.Ed.2d 155 (1959). Further, the phrase "rates of pay, rules, or working conditions" is a term of art in labor law, "a shorthand abbreviation of labor bargaining." Id. The RLA requires bargaining in railway labor disputes to take place between the railroad and the certified representative of the craft or class, 45 U.S.C. Sec. 152 Ninth, in this case KCS and UTU. The railroad's duty to bargain does not extend to the certified representative of a craft or class whose collective bargaining agreement is not the subject of the dispute.
 
 
 15
 BLE's claim of a "bargainable interest" in UTU's crew consist dispute with KCS is particularly specious in view of the fact that BLE and KCS had independently reached agreement on the same crew consist issues (presumably without notice to UTU). See Brief for Appellants at 5. The KCS-UTU arbitration sought to reach a crew consist agreement pertaining to UTU members, and while Side Letter No. 3 may (or may not) have an effect on BLE membership rosters, it does not impact any BLE-KCS agreement affecting rates of pay, rules, or working conditions. See Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n, 491 U.S. 490, 503-04, 109 S.Ct. 2584, 2593, 105 L.Ed.2d 415 (1989) (holding no notice was required before sale of railroad's assets, as the sale would not affect any written or implied agreement on working conditions). Again, the agreement that was changed was between UTU and KCS, not between BLE and KCS.
 
 
 16
 In its reply brief BLE suggests that the individual appellants were entitled to notice separate and apart from BLE. We agree with the Tenth Circuit, however, that "[t]he bargaining agent is the representative of the craft" and Sec. 6 does not require "personal notice to employees." McMullans v. Kansas, Okla. & Gulf Ry., 229 F.2d 50, 56 (10th Cir.), cert. denied, 351 U.S. 918, 76 S.Ct. 710, 100 L.Ed. 1450 (1956).
 
 
 17
 The cases cited by BLE as persuasive authority need not detain us long. They concern representational disputes between two unions where one of them, but only one, was going to acquire a new employee group to represent; or they deal with a tripartite agreement (among a railroad and two unions) that covered working conditions within two crafts. Clearly both unions in each such case would have a "bargainable interest," and no useful analogies can be drawn between those cases and the situation we face here. We hold that neither the individual appellants nor the BLE were entitled to Sec. 6 notice of the negotiation and arbitration that led to Side Letter No. 3.
 
 II.
 
 18
 BLE also contends that Side Letter No. 3 violates RLA Sec. 2 Eleventh (c). As discussed above, under the terms of Sec. 2 Eleventh (c), a railroad operating employee subject to union shop obligations cannot be forced to join the union representing his craft if he is a member in good standing of a union representing another operating craft (yet he is always free to switch affiliation to any union for which he is eligible if he so chooses). BLE contends that Side Letter No. 3 is in substance a union shop agreement that requires dual union membership in violation of subparagraph (c). We disagree.
 
 
 19
 Under Sec. 2 Eleventh (a), a railroad and an authorized union are permitted "to make agreements, requiring, as a condition of continued employment that ... all employees shall become members of the labor organization representing their craft or class." 45 U.S.C. Sec. 152 Eleventh (a). Thus the RLA authorizes union shop agreements. Section 2 Eleventh (c), which provides that union shop agreements may be satisfied by membership in another union, is applicable only to a "requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a)." 45 U.S.C. Sec. 152 Eleventh (c) (emphasis added). "In other words, the prohibitions against dual unionism contained in Section 2, Eleventh (c) only kick in when the agreement at hand purports to be a union shop agreement made pursuant to Section 2, Eleventh (a)." Dempsey, 16 F.3d at 838. BLE argues that Side Letter No. 3 is in fact a subparagraph (a) agreement because it requires UTU membership "as a condition of continued employment" in substance if not in form or, in the alternative, because it modifies the collective bargaining agreement between UTU and KCS, which is a subparagraph (a) agreement, and thus should itself be treated as a subparagraph (a) agreement.[5] We find those arguments unpersuasive.
 
 
 20
 Membership in UTU is not a condition of continued employment under the terms of Side Letter No. 3. No engineer, regardless of whether he came to that position via train service, may be terminated for failure to join or to retain membership in UTU. No employee, returning to train service having joined BLE, may be terminated for declining to join UTU. No accumulated seniority in train service will be lost if a junior engineer/former trainman declines to retain membership in UTU. BLE argues that UTU membership becomes a condition of employment because a junior engineer recently promoted to that position and thus low in engine service seniority, who chooses not to retain UTU membership, might be bumped back to train service but without sufficient accrued train service seniority to regain employment there, resulting in his furlough; were the furlough to last for more than a year, he would be ineligible for recall, and then he would be out of work. We are not persuaded by this argument, for the scenario it presents is far too speculative to permit us to hold that Side Letter No. 3 requires UTU membership as a "condition of continued employment."
 
 
 21
 We also reject the argument that the side letter modifies a true subparagraph (a) agreement (the overall UTU-KCS agreement) and thus qualifies as a subparagraph (a) agreement itself. The side letter is exactly that, a supplementary agreement in addition to the main agreement, and the text does not suggest that it is modifying any particular provision of an existing agreement. The side letter concerns itself only with the time that train service employees spend working outside the craft.
 
 
 22
 Even if we were to hold that Side Letter No. 3 is a union shop agreement under subparagraph (a), we would still reject BLE's argument because the side letter does not require UTU membership in addition to affiliation with another craft union, a requirement that would be prohibited by subparagraph (c). Nothing in the plain language of Side Letter No. 3 prevents a railroad employee from quitting UTU when he is not working as a train service employee and switching union affiliations if he so chooses. Granted, continued membership in UTU may well be in the best interests of a recently promoted engineer, at least in the short term. But the RLA does not prohibit a union representing one craft from negotiating terms with the employer that may render membership in that union more attractive to some employees than membership in another union for which those employees may be eligible. No one is forced to join a particular union but is free to choose, assuming eligibility. Competition among the unions, short of compelled membership, is not illegal under the RLA.
 
 
 23
 BLE also claims that Side Letter No. 3 "upsets the sharing of costs of representation promoted by the 1951 amendments" and that it "was entered into with the intent of upsetting the financial support for BLE's collective bargaining activities." Brief for Appellants at 44, 45. Apart from explaining to us the duties it has as bargaining representative for the engineers, BLE does not elaborate on how Sec. 2 Eleventh (c) is violated. UTU has parallel duties to its members, the train service employees, and thus does in fact share in the costs of representation. In any case, as far as we can discover, the RLA was not enacted to ensure the continued financial stability of any union, and the law does not purport to guarantee a particular level of member support. It is clear that the BLE, in making this argument, misapprehends the purpose and scope of the RLA. The Supreme Court found that Congress enacted Sec. 2 Eleventh in 1951 in response to concerns that "all members of a bargaining unit ... pay their fair share of the costs of performing the function of exclusive bargaining agent," Ellis, 466 U.S. at 446, 104 S.Ct. at 1891, and to our knowledge the Court has said nothing about Sec. 2 Eleventh's purpose being to facilitate cost-sharing among the unions. Moreover, BLE directs us to nothing in the record that suggests it was ever UTU's or KCS's intent to interfere with BLE's financial support (assuming that the side letter will even have that effect, a matter not yet known), and such an intent cannot be attributed to KCS or UTU absent any evidence to support the attribution.
 
 III.
 
 24
 BLE also challenges Side Letter No. 3 as a violation of paragraphs Third and Fourth of RLA Sec. 2, which provide for designation of labor representatives, and for the freedom to organize and to bargain collectively, without interference from the carrier. 45 U.S.C. Sec. 152 Third, Fourth.
 
 
 25
 BLE's first argument on this issue is that Side Letter No. 3 violates the RLA because it is an attempt by the employer to deduct union dues from employee wages. Such action would be prohibited by Sec. 2 Fourth, which makes it unlawful for employers "to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions." 45 U.S.C. Sec. 152 Fourth. Involvement by the railroad in the collection of dues is permitted, however, under Sec. 2 Eleventh (b), which allows a railroad and an authorized bargaining representative (union) "to make agreements providing for the deduction by [the railroad] from the wages of its ... employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues ... uniformly required as a condition of acquiring or retaining membership," but only with the written authorization of the employee. 45 U.S.C. Sec. 152 Eleventh (b); see also id. Sec. 152 Eleventh (d) (amending Sec. 152 Fourth to the extent it conflicts with Sec. 152 Eleventh). BLE argues that, if Side Letter No. 3 is not a union shop agreement under Sec. 2 Eleventh (a) (and we have held in Part II that it is not), then the agreement cannot be valid under Sec. 2 Eleventh (b), and is per se invalid under Sec. 2 Fourth.
 
 
 26
 BLE misreads Sec. 2 Eleventh (b). That subparagraph permits the employer, by agreement of all parties involved and without regard to whether that agreement is a union shop agreement, to deduct union dues from wages. Unlike Sec. 2 Eleventh (c), see supra at 792-93, subparagraph (b) does not reference subparagraph (a) wherein the authority to make union shop agreements is set out. Although a railroad cannot unilaterally deduct from wages for union dues, it may do so by agreement with the union and with the consent of the employee, irrespective of whether the union and the railroad have a union shop agreement.
 
 
 27
 It is true that the side letter would violate Sec. 2 Fourth if it provided for unilateral wage deduction by KCS for union dues. But Side Letter No. 3 by its terms is neither an agreement with UTU to deduct dues nor a unilateral pronouncement by KCS that it will deduct dues from wages. If deductions for dues are authorized at all, presumably it is the overall KCS-UTU agreement that so provides. No dues are deducted pursuant to Side Letter No. 3.
 
 
 28
 BLE's argument that the side letter violates RLA Sec. 2 Third and Fourth because it "interfere[s] with, influence[s], or coerce[s] [KCS employees] in [their] choice of representatives," 45 U.S.C. Sec. 152 Third, and "influence[s] or coerce[s] employees in an effort to induce them to join or remain or not to join or remain members of any labor organization," id. Sec. 152 Fourth, is also flawed. BLE would have us hold that this language is for our purposes the same as the unfair labor practices provision of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158 (1988), and then apply NLRA precedent here. We decline to do so.
 
 
 29
 We initially note that "[t]he NLRA ... exempts employees who are subject to the Railway Labor Act, and the inapplicability of Sec. 8(b) to railroad employees was specifically pointed out during the congressional debates on the NLRA." Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 391, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (1969) (citations omitted). Thus "the NLRA has no direct application to the present case." Id. at 377, 89 S.Ct. at 1114.
 
 
 30
 Notwithstanding the inapplicability of the NLRA to railroad employees, there is no question that judicial decisions on issues raised under the RLA may be informed by "carefully drawn analogies from the federal common labor law developed under the NLRA." Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 432, 109 S.Ct. 1225, 1229-30, 103 L.Ed.2d 456 (1989). We will not find NLRA precedent persuasive, however, in the face of relevant RLA precedent. See Dempsey, 16 F.3d at 840-41. Given the RLA precedent that we cite below, we reject BLE's attempts to induce us to apply contrary NLRA authority.
 
 
 31
 Paragraphs Third and Fourth of Sec. 2 are part of the 1934 amendments to the RLA, and the Supreme Court from the beginning has "viewed [the amendments] as addressing primarily the precertification rights and freedoms of unorganized employees." Trans World Airlines, 489 U.S. at 440, 109 S.Ct. at 1233. The Court found that the ability of railroad employees to select their representatives without interference from the railroad, and thus to have representation independent of the railroad, was essential to effective implementation of the RLA's "exhaustively detailed procedural framework 'to facilitate the voluntary settlement of major disputes.' " Id. at 441, 109 S.Ct. at 1234 (quoting Jacksonville Terminal, 394 U.S. at 378, 89 S.Ct. at 1115). KCS employees are organized and have been for years. Both BLE and UTU (or their predecessors) were certified as bargaining representatives of KCS employees long ago, and no one is suggesting that another union be certified to replace BLE or UTU. Thus there is no precertification or decertification issue here. BLE remains free to represent, and continues to represent, engine service employees of KCS.
 
 
 32
 We do not hold, however, that causes of action under Sec. 2 Third and Fourth are available only in precertification cases, but the availability of the remedy is limited in postcertification circumstances. This Court has held, in a postcertification case, that no cause of action lies under Sec. 2 Third when the complaining party "fail[s] to present adequate evidence that [the railroad's] actions have been motivated by anti-union animus or that [the railroad's] actions were an attempt to interfere with its employees' choice of their collective bargaining representative." Tello v. Soo Line R.R., 772 F.2d 458, 462 (8th Cir.1985). We hold that the same applies to an action under Sec. 2 Fourth. See National R.R. Passenger Corp. v. International Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 51 (1st Cir.1990).
 
 
 33
 BLE claims interference with its representation of KCS employees as a result of Side Letter No. 3, but nowhere in the record before us can we find any evidence (as distinguished from conclusory statements) of anti-union animus on the part of KCS. Moreover, BLE's argument that KCS is favoring one union over another belies any suggestion that KCS harbors hostility toward unions in general. Side Letter No. 3 does not, either overtly or inherently, discourage union activities or discriminate against those who encourage such activities. Further, there is nothing in the record that raises a genuine issue of fact as to whether KCS was attempting to interfere with its employees' selection of BLE as a bargaining representative when it negotiated Side Letter No. 3 with UTU. Because we find no evidence of anti-union animus or attempted interference, we hold that Side Letter No. 3 does not violate RLA Sec. 2 Third and Fourth.
 
 
 34
 We agree with the District Court that there are no genuine issues of material fact and that, as a matter of law, Side Letter No. 3 does not violate the RLA. Therefore the District Court's summary judgment for UTU and KCS is affirmed.
 
 
 
 *
 The HONORABLE DONALD D. ALSOP, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Dean Whipple, United States District Judge for the Western District of Missouri
 
 
 [2]
 BLE also represents firemen who work for KCS on what was formerly the Louisiana and Arkansas Railway
 
 
 [3]
 The letter, at least as reproduced in the record before this Court, is undated and unsigned
 
 
 [4]
 Because the controversy over the side letter concerns the creation of contractual rights, it is, in RLA parlance, a "major" or "interest" dispute, as opposed to a "minor" or "grievance" dispute that arises either out of the interpretation or application of an existing agreement or from a grievance lodged under the terms of the agreement. See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989)
 
 
 [5]
 We reject without further discussion and as improper argument BLE's allegations, based not upon anything in the record here but upon BLE's reading of old cases, that UTU's side letter agreement with KCS reflects a historical pattern of attempts "to use the union shop requirements to threaten and coerce railroad employees to become members of its organization rather than belong to the rival or alternate organizations recognized and sanctioned by the RLA as the representatives of the operating crafts of railroad employees." Brief for Appellants at 41