Robert **HELD**, et al., Plaintiffs,

and

**The Allied Pilots Association, Plaintiff–Intervenor,**

v.

**AMERICAN AIRLINES, INC., Defendant.**

No. Civ.A. 97–906(RMU).

United States District Court, District of Columbia.

May 22, 1998.

Paul Alan Levy, Public Citizen Litigation Group, Washington, DC, for Robert Held, Mark Hunnibell, Daniel Carey, John K. Cutter.

David Palmer Dean, James & Hoffman, P.C., Washington, DC, for Allied Pilots Ass'n, intervenor–plaintiff.

Thomas Edward Reinert, Jr., Morgan, Lewis & Bockius, L.L.P., Washington, DC, for American Airlines, Inc.

## MEMORANDUM OPINION AND ORDER

URBINA, District Judge.

**Denying the Defendant's Motion to Dismiss, or in the Alternative for Summary Judgment; and Denying the Plaintiff's Motion for Summary Judgment on Liability**

Individual plaintiffs and Plaintiff–Intervenor (collectively hereinafter "plaintiffs") brought suit alleging that the defendant violated the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, by imposing a workplace solicitation ban in all flight operations areas. Both seek declaratory and injunctive relief under the RLA to invalidate the ban which specifically prohibits all non-work related communications, including union contract rat-

ification campaigns.[1] The plaintiffs in this action are individual pilots Robert Held, Mark Hunnibell, Daniel Carey, John Cutter and their certified union representative, Plaintiff–Intervenor APA. The defendant in this action is American Airlines, Inc. ("American"), an interstate carrier by air within the meaning of the Section 181 of the RLA. 45 U.S.C. § 181. This matter comes before the court on cross-motions for summary judgment by the defendant and the individual plaintiffs. The defendant claims that the court lacks subject matter jurisdiction over this matter because under Section 2 Third and Fourth of the RLA, 45 U.S.C. § 152 Third and Fourth, judicial intervention is substantially circumscribed once a union has been certified. In moving for summary judgment, the individual plaintiffs contend that the defendant violated established precedent protecting union related communications when it discriminatorily enforced a general solicitation ban only against intra-union campaigning. Upon consideration of the parties' submissions and the relevant law, the court denies both motions.

## I. Background

The APA represents approximately 9,000 American Airline pilots under the provisions of the RLA. Beginning in June 1994, the APA and American engaged in negotiations to revise the then current CBA that governed the terms and conditions of employment for American's pilots. After reaching an agreement on September 2, 1996, the proposed CBA failed ratification in a mail ballot referendum. Thereafter, negotiations resumed under the direction of the National Mediation Board but attempts to reach another agreement ultimately proved unsuccessful. Consequently, the APA initiated a worldwide strike against American shortly after midnight on February 15, 1997. Soon after the strike commenced, President Clinton intervened to stop the strike and appointed a Presidential Emergency Board to investigate the dispute pursuant to Section 10 of the RLA. The parties resumed negotiations over remaining unresolved issues from the February 1997 session on Orcas Island, Washington and reached another tentative agreement on March 17, 1997. As with the September 1996 agreement, the individual plaintiffs and other pilots began an opposition campaign to convince other pilots to reject the March 1997 contract. During this ratification period, a dispute arose between American and several pilots opposed to the tentative CBA concerning their campaigning efforts in American's flight operations areas.

In nine of the airports American operates its network of planes, it also maintains crew bases for pilots called "flight operations." The flight operations areas usually consists of several different specialized sub-areas. One sub-area serves as a flight planning center where pilots can prepare for their upcoming flight by receiving weather updates and flight plans. The flight operations areas also includes non-flight planning locations where pilots may tend to non-work related matters such as picking up their paychecks, socializing, attending social events and discussing union related affairs. Beginning on April 16, 1997 to the morning of the April 18, 1997, several incidents between anti-ratification pilots and American occurred, resulting in CBA opponents either being ejected from the flight operations areas or directed to refrain from disseminating anti-ratification materials. As a result of these events, on April 18, 1997 American's Chief Pilot Cecil Ewell responded to an APA request and issued a directive to allow off-duty pilots to enter the flight operations areas and solicit near the union bulletin board.

Although Ewell issued the directive to prevent future confrontations between the anti-ratification pilots and American, the disunities persisted to continue. One instance occurred later the same day Ewell issued his

---

1. On April 29, 1997, individual plaintiffs sought a preliminary injunction and temporary restraining order against the defendant from implementing changes in a proposed collective bargaining agreement ("CBA") negotiated with the Allied Pilots Association ("APA"). After the CBA was ratified by a large margin, the individual plain-

tiffs withdrew their motion and the court denied their emergency request as moot on May 5, 1997. Subsequently, the individual plaintiffs and Plaintiff–Intervenor APA separately filed amended complaints for declaratory and injunctive relief on the merits of the workplace solicitation ban.

directive. American Chief Pilot Bob Kudwa allegedly grabbed Plaintiff Held and attempted to move him closer to the union bulletin board while he was campaigning against the proposed CBA. Other reports indicate that the CBA opponents' disruptive activities in the flight operations areas led several pilots to file complaints to American about the anti-ratification solicitations. One such incident occurred on April 20, 1997 when a group of five pilots allegedly formed a gauntlet in the hallway at the entrance to the flight operations areas, confronted each pilot reporting for duty, and restricted the pilots from entering. The next day on April 21st, Ewell rescinded his April 18th authorization and banned all solicitations in the flight operations areas claiming that the disruption caused by off-duty pilots campaigning against the proposed CBA adversely impacted the safety of flight operations. The ban specifically restricted all communications except those related to the safe operation of aircrafts and was imposed throughout all airports American maintained flight operations areas. As an added measure to ensure the safety of flight operations, Managing Director of Labor Relations John Russell, by memorandum dated April 25th, instructed management pilots to order CBA opponents to leave the flight operations areas if they did not cease and desist upon request.

In response to Ewell's April 21st directive, nine grievances, including two APA Presidential grievances, were filed challenging American's restriction on pilot solicitation and distribution relating to CBA ratification in flight operations areas. The individual plaintiffs and the APA also brought suit in the above-captioned action under the RLA and contend that the solicitation ban is a pretext for retaliating against the union. Specifically, they claim that American's selective enforcement of the ban against only pilots who opposed the CBA constitutes a violation under the RLA § 152, Third and Fourth. In support of this claim the plaintiffs cite other non-work activities which are more disruptive than their campaigning which routinely take place in the flight operations areas, including sales demonstrations, retirement parties, and charity solicitations. Moreover, after the CBA opponents failed to block ratification of the proposed CBA, the plaintiffs contend that American continued to single out CBA opponents during APA's national union officer elections by permitting only those pilots who openly supported the proposed CBA to campaign for office in flight operations areas.

## II. Standard of Review

When presented with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining in each case whether a judgment may be entered in accordance with Rule 56 of the Federal Rules of Civil Procedure. *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (2d ed.1987). Rule 56(c) provides that, "summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates summary judgment if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To meet its burden, the moving party must demonstrate that there is an absence of evidence to support the non-moving party's case. *Id.* 477 U.S. at 325, 106 S.Ct. 2548. The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). The court construes all evidence in favor of the non-movant, and all justifiable inferences are to be drawn in his favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## III. Discussion

### A. Denying the Defendant's Motion for Summary Judgment[2]

In moving for judgment pursuant to Federal Rules of Civil Procedure 56(c), the defendant contends that the court lacks subject matter jurisdiction because the present controversy qualifies as a "minor" dispute according to the provisions of the Railway Labor Act and thus within the exclusive jurisdiction of the System Board of Adjustment. Alternatively, the defendant argues that the Supreme Court in *TWA v. Independent Federation of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) ("*TWA v. IFFA*"), substantially circumscribed judicial intervention for claims brought under RLA Section 2 Third or Fourth, 45 U.S.C. §§ 152 Third or 152 Fourth, once a union has been certified. More specifically, the defendant claims that any alleged anti-union acts cannot justify judicial intervention because they do not constitute (1) "a fundamental blow to union or employer activity and the collective bargaining agreement itself," *TWA v. IFFA*, 489 U.S. at 442, 109 S.Ct. 1225 and (2) that the arbitration and negotiation procedures of the RLA cannot effectively address and resolve the dispute. The court disagrees on both contentions and denies the defendant's motion.

■ As a threshold matter, the court concludes that it has subject matter jurisdiction over the present matter. When Congress enacted the RLA it intended to provide a comprehensive framework for the resolution of labor disputes in the airline industry. Disputes between labor and management under the RLA are classified as either "minor" or "major" disputes. *Air Line Pilots Association, Int'l., v. Eastern Air Lines, Inc.*, 863 F.2d 891, 895 (D.C.Cir.1988). Minor disputes—those arising out of the interpretation of collective bargaining agreements—must be submitted to an arbitration board for resolution.[3] *Id.* at 895–96 (citations omitted). Such disputes are under the exclusive jurisdiction of the arbitration board; federal courts cannot adjudicate those claims. *Id.* Although, the arbitration board has exclusive jurisdiction over certain grievance processes, the RLA's mechanism for resolving "minor" disputes does not pre-empt causes of action to enforce rights that are independent of the collective bargaining agreement. *Fennessy v. Southwest Airlines*, 91 F.3d 1359, 1362 (9th Cir.1996) (citing *Hawaiian Airlines v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). The plaintiffs have a right to litigate in federal court claims based on violations of specific statutory sections under the RLA, such as Section 2 Third or Fourth. The mere fact that the plaintiffs' claim could be grieved on contractual grounds under the CBA does not mean that their statutory claim under the RLA is a "minor" dispute. *Id.* Accordingly, the court has jurisdiction to adjudicate the plaintiffs' statutory claims under the RLA even though contractual disputes under the collective bargaining agreement is under the exclusive jurisdiction of an RLA arbitration board.

■ Entirely apart from the issue of the plaintiffs' ability to seek relief under the statutory provisions of the RLA, the court still must determine whether the RLA extends to the circumstances of this case. Section 2 Third prohibits unions or carriers to "in any way interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. § 152, Third.[4] Section 2

---

2. Pursuant to Fed.R.Civ.P. 12(b), the defendant's motion shall be treated as one for summary judgment and disposed of as provided under Fed.R.Civ.P. 56 because the court has considered and made reference to matters outside the pleadings.

3. In contrast, "major" disputes "[relate] to disputes over the formation of collective [bargaining] agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Elgin, Joliet and Eastern Ry. Co. v. Burley*, 325 U.S. 711, 722–24, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

4. 45 U.S.C. § 152, Third in its entirety provides:

Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representa-

Fourth grants employees "the right to organize and bargain collectively through representatives of their own choosing," and provides that "no carrier shall influence or coerce employees in an effort to induce them ... not to join or remain members of any labor organization...."[5] These provisions prohibit employers from interfering with, coercing or influencing the representational choices of workers and from interfering with the right of employees to organize in labor unions. *Eastern Air Lines, Inc.*, 863 F.2d at 893. In *TWA v. IFFA*, the Supreme Court held that as part of the 1934 amendments to the RLA, Section 2 Third and Fourth have been viewed "as addressing primarily the pre-certification rights and freedoms of unorganized employees," who seek to designate representatives and commence collective bargaining with employers. *TWA v. IFFA*, 489 U.S. at 440, 109 S.Ct. 1225. The Supreme Court reasoned that the effectiveness of the RLA's "exhaustively detailed procedural framework 'to facilitate the voluntary settlement of major disputes,'" depended on the initial assurance that employees could select their representative without influence from the employer. *Id.* 489 U.S. at 441, 109 S.Ct. 1225 (quoting *Trainmen v. Jacksonville Terminal*, 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)). By contrast, in post-certification controversies a certified representative and a collective bargaining agreement exist, therefore judicial intervention is available in only limited circumstances. *Id.* 489 U.S. at 441–42, 109 S.Ct. 1225.

■ The defendant argues that the pre-certification / post-certification distinction established by the Supreme Court in *TWA v. IFFA*, articulated a heightened jurisdictional barrier for all post-certification controversies. Specifically, the defendant argues that in order to establish federal court jurisdiction the plaintiffs must demonstrate "a fundamental blow to union or employer activity and the collective bargaining process itself," *TWA v. IFFA*, 489 U.S. at 442, 109 S.Ct. 1225 and that the negotiation and arbitration procedures of the RLA cannot effectively address and resolve their dispute. Although, the defendant correctly contends that there are limited bases where courts may intervene in post-certification disputes, the defendant incorrectly cites the relevant jurisdictional standard in such cases. The court concludes that the appropriate framework for "judicial intervention in RLA procedures [is] limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the [RLA].'" *Id.* 489 U.S. at 441, 109 S.Ct. 1225 (quoting *Switchmen v. National Mediation Board*, 320 U.S. 297, 300, 64 S.Ct. 95, 88 L.Ed. 61 (1943)); *see also Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 923 (7th Cir.1993) (determining *TWA v. IFFA's* jurisdictional test under the RLA is whether

tives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

5. 45 U.S.C. § 152, Fourth in its entirety provides:

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier

in maintaining or assisting or contributing to a labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: Provided, that nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

plaintiffs would have a remedy absent the jurisdiction of federal courts).

Since Supreme Court's decision in *TWA v. IFFA,* the D.C. Circuit has not yet addressed when judicial intervention in post-certification disputes would be appropriate under Section 2 Third or Fourth. Other Circuits, however, have articulated specific circumstances that would permit federal court jurisdiction when plaintiffs would not have a remedy absent judicial intervention. Specifically, courts will intervene in circumstances where

the employers' conduct has "been motivated by anti-union animus or ... an attempt to interfere with its employees' choices of their collective bargaining representative," *Tello v. Soo Line R.R.,* 772 F.2d 458, 462 (8th Cir.1985), or constitutes "discrimination or coercion" against that representative, *International Brotherhood of Teamsters v. Pan American World Airways,* 607 F.Supp. 609, 614 n. 5 (E.D.N.Y.1985) or involves "acts of intimidation [which] cannot be remedied by administrative means," *Local Union 808 v. P & W Railroad Co.,* 576 F.Supp. 693, 703 (D.Conn. 1983).

*Independent Union of Flight Attendants v. Pan American World Airways,* 789 F.2d 139, 142 (2nd Cir.1986); *see also Davies v. American Airlines, Inc.,* 971 F.2d 463, 468 (10th Cir.1992) (same); *Wightman v. Springfield Terminal Railroad Co.,* 100 F.3d 228, 234 (1st Cir.1996) (same); *Brotherhood of Locomotive Engineers v. Kansas City Southern Railway Co.,* 26 F.3d 787, 795 (8th Cir.1994) (same). In addition, courts will also intervene under Section 2 Third and Fourth "if the employer engaged in a 'fundamental attack on the collective bargaining process' ... or a 'direct attempt to destroy a union.'" *See National Railroad Passenger Corp. v. Int'l Ass'n of Machinists and Aerospace Workers,* 915 F.2d 43, 51 (1st Cir.1990) (citations omitted). In this case, the court concludes that the plaintiffs have demonstrated a sufficient cause of action under Section 2 Third and Fourth of the RLA on the grounds that the defendant implemented a solicitation ban because of anti-union animus.

 Presently, the plaintiffs claim that the defendant's alleged acts unlawfully interfered with internal union affairs when it implemented a ban on all non-work communications in flight operations areas. In analyzing anti-union animus claims under Section 2 Third and Fourth, the this Circuit has previously applied the Wright Line principle in this area. *See Eastern Airlines,* 863 F.2d at 902; *May v. Shuttle,* 129 F.3d 165, 176 (D.C.Cir.1997); *see also NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (citing *Wright Line,* 251 N.L.R .B. 1083 (1980), *enf. granted, NLRB v. Wright Line,* 662 F.2d 899 (1st Cir.1981)). The Wright Line principle requires the plaintiff first to demonstrate that anti-union animus was a substantial or motivating factor in the defendant's actions. *Eastern Airlines,* 863 F.2d at 902. If satisfied, then the defendant must prove that it would have taken those measures absent any anti-union animus by citing a legitimate business purpose for its action. *Id.*

In this case, the plaintiffs have provided sufficient proof to raise the inference that anti-union animus was a substantial or motivating factor behind the challenged decision. An April 25, 1997 memorandum by Managing Director of Labor Relations John Russell to "All Chief Pilots," and the selective targeting of ratification opponents demonstrate a causal connection between the solicitation ban and alleged anti-union animus. The memorandum, in part, instructed all management pilots to give pilots engaged in discussions concerning ratification "direct orders" to leave the area if the offending pilot did not cease upon request. The plaintiffs claim that the defendant then implemented the solicitation ban specifically to target ratification opponents under the guise of maintaining order and safety in its airport operations. The plaintiffs support this assertion with several affidavits that contain statements describing how the defendant selectively enforced the ban only against ratification opponents despite allowing other disruptive activities to continue to take place in the flight operations area without challenge, including sales demonstrations, charity solicitations, and occasional parties. *See* Second Affidavit of Robert Held, ¶¶ 3–5, Affidavit of Steve Dudley, ¶¶ 25–27, Affidavit of Andrew Sizemore ¶ 10.

The plaintiffs also supplement their proof of anti-union animus by citing other related incidents which demonstrate the defendant's unlawful acts. The plaintiffs submitted an affidavit attesting to how American continued to single out CBA opponents during APA's national union officer elections by permitting only those pilots who openly supported the proposed CBA to campaign for office in flight operations areas. *See* Affidavit of Andrew Sizemore, ¶¶ 2, 8.

In its motion for summary judgment the defendant justifies its reason for imposing the solicitation ban. It states that it imposed a ban on all non-work communications because the anti-ratification campaigning was causing disruption in the "flight operations" areas. The defendant specifically points to an incident on April 20, 1997, when a group of approximately five anti-ratification pilots stationed themselves at the flight operations entrance and restricted access of other pilots to the area by forming a gauntlet and confronting pilots reporting for duty. *See* Ewell Decl. ¶ 11. Based on this incident, Chief Pilot Cecil Ewell rescinded his prior authorization which permitted off-duty pilots to solicit in the flight operations room. The plaintiffs contend that the justified reason is a pretext for anti-union animus because the solicitation ban was only enforced against ratification opponents. As the nonmoving party under Rule 56, the plaintiffs have demonstrated sufficient evidence to establish the existence of a genuine dispute regarding the legitimacy of the solicitation ban to preclude granting summary judgment for the defendant. Fed.R.Civ.P. 56. The question of what prompted and what the defendant actually sought to achieve by the solicitation ban raises a material issue very much in dispute in this controversy. Was it action intended to stop disruption or was it a manifestation of anti-union animus aimed at ratification opponents? As mentioned previously, the plaintiffs have demonstrated that such speech is not more disruptive or unsafe than other activities that are permitted to continue in the flight operations area. *See* Second Affidavit of Robert Held, ¶¶ 3–5. Also, there is a dispute as to how disruptive the ratification opponents were which prompted revoking the prior approval to solicit in the flight

operations areas. Accordingly, since the record demonstrates that a genuine issue of material fact exists summary judgment is not justified at this juncture.

## B. Individual Pilots' Motion for Summary Judgment on Liability

For the reasons set forth above, the court denies the plaintiffs' cross-motion for summary judgment due to factual disputes as to whether the solicitation ban was issued because of safety concerns in flight operations areas or anti-union animus. Additionally, discovery will reveal facts that would assist the court in resolving any issues of liability under the RLA. Accordingly, the court denies the plaintiffs' motion for summary judgment.

Accordingly, it is this 22nd day of May 1998,

**ORDERED** that the plaintiffs' motion for an extension of time be and is hereby **GRANTED** *nunc pro tunc;* it is

**FURTHER ORDERED** that the defendant's Motion to Dismiss, or in the alternative, Motion for Summary Judgment be and is hereby **DENIED;** it is

**ORDERED** that the individual plaintiff's Motion for Summary Judgment on Liability be and is hereby **DENIED;** it is

**FURTHER ORDERED** that the parties are directed to engage in mediation until **June 14, 1998;** it is

**ORDERED** that discovery, if needed, shall begin on **June 15, 1998** and be completed on or before **September 15, 1998;** it is

**FURTHER ORDERED** that Dispositive motions are due on or before **October 9, 1998;** Oppositions to dispositive motions are due on or before **November 6, 1998;** and Replies are due on or before **November 27, 1998;** and it is

**ORDERED** that a final status conference is hereby set for **January 12, 1999 at 9:00 A.M.**

**SO ORDERED.**