James MAY, et al., Appellants,

v.

SHUTTLE, INC., et al., Appellees.

No. 96–7233.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1997.

Decided Nov. 12, 1997.

Rehearing Denied Jan. 9, 1998.

Before: SILBERMAN, WILLIAMS, and ROGERS, Circuit Judges.

## *J U D G M E N T*

PER CURIAM.

This cause came to be heard on the record on appeal from the United States District Court for the District of Columbia, and was briefed and argued by counsel. On consideration thereof, it is

**ORDERED** and **ADJUDGED**, by this Court, that the judgment of the District Court appealed from in this cause is hereby affirmed. It is

**FURTHER ORDERED**, by this Court, that the district court's memorandum opinion in *May v. Shuttle, Inc.*, No. 94cv01019, 1996 WL 774536 (D.D.C. Sept. 5, 1996) is hereby published as if it were an opinion of our court. We note, however, that the collective bargaining agreement between Trump Shuttle, Inc. and the International Association of Machinists and Aerospace Workers expired on December 31, 1989. Thereafter, the only function the agreement could have performed would have been to serve as the temporary "status quo" while the parties pursued the "major dispute" collective bargaining procedures of Sections 5 and 6 of the Railway Labor Act. But for the reasons made clear by the district court, Shuttle could have been under no obligation to engage in such bargaining in the absence of a certified representative with which to bargain. Therefore it is unnecessary for us to decide whether

any terms of a collective bargaining agreement may survive the loss of union representation (an issue which we previously addressed in passing). *See Association of Flight Attendants v. United Airlines, Inc.*, 71 F.3d 915, 918 (D.C.Cir.1995). It is

**FURTHER ORDERED**, by this Court, *sua sponte*, that the Clerk shall withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. *See* D.C.Cir. R. 41(a)(1) (January 1, 1994). This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.

ATTACHMENT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Issued Sept. 5, 1996

Civil Action No. 94–1019(NHJ)

James May, et al., Plaintiffs,

v.

Shuttle, Inc., et al., Defendants.

### *MEMORANDUM OPINION*

Plaintiffs are eighty-six former USAir Shuttle fleet service workers.[1] The five defendants are Shuttle, Inc. ("Shuttle"), USAir, Inc. ("USAir"), International Association of Machinists and Aerospace Workers ("IAM"), Citicorp, and Citibank, N.A. Before the Court are the motions for summary judgment filed by all defendants, as well as the motion of plaintiffs for summary judgment on the issue of the single carrier proceeding and the motion of nineteen of the plaintiffs ("Barone *et al.*") for summary judgment on certain age discrimination issues. Shuttle has also filed a cross-motion for summary judgment on the issues raised by Barone *et al.* Altogether, there are seven motions for summary judgment to be resolved at this time. The Court heard oral argument from the parties on all seven motions on June 21,

25, and 27, 1996. Upon consideration of the motions, the supporting and opposing memoranda, the oral argument of counsel, and the entire record herein, the Court concludes that it must grant the motions of all defendants and deny the motions of plaintiffs.

### *Background*

Most of the plaintiffs formerly worked at Eastern Air Lines as fleet service workers for the Eastern Shuttle. The Eastern Shuttle offered hourly, unreserved flights between New York and Washington, and between New York and Boston. Plaintiffs' basic job duties included handling baggage, cleaning aircraft, and guiding aircraft to and from passenger gates. Plaintiffs were represented by IAM, which had negotiated a collective bargaining agreement with Eastern on plaintiffs' behalf. In 1989, in the midst of a prolonged strike, Eastern sold the Shuttle to Donald Trump. He financed the purchase through a $380 million loan from a syndicate of twenty-two banks, including defendant Citibank. The newly named Trump Shuttle began operations on June 7, 1989. Trump hired plaintiffs to staff the Trump Shuttle, and Trump Shuttle and IAM entered into a collective bargaining agreement. Forty-nine plaintiffs worked at LaGuardia Airport in New York, New York ("LaGuardia"), twenty-three worked at Logan Airport in Boston, Massachusetts ("Logan"), and fourteen worked at Washington National Airport in Arlington, Virginia ("National").

By 1990, Trump Shuttle and Donald Trump were experiencing serious financial difficulties. Trump Shuttle never made a profit, in part because of the large debt incurred by Trump to purchase and upgrade the Shuttle. By September 1990, the Trump loans were in default and the banks sought to restructure the debt. The banks decided to assume ownership of the Shuttle and began to search for a major airline to manage it in order to avoid selling the Shuttle in the depressed airline market. They decided to attempt to improve the Shuttle's operating

---

1. Two of the original plaintiffs, Raymond Heim and Pierre L. Schrichte, have been voluntarily dismissed. One of the original plaintiffs, Kenneth Wall, is now deceased and the administrator of his estate has been substituted.

performance, contemplating a sale at a later date.

After failed negotiations with Northwest Airlines, the banks reached an agreement with USAir. The complex management agreement with USAir provided that USAir would manage the Shuttle for ten years, with an option to buy. Under the agreement, USAir would be responsible for Shuttle operations, including fares, financial record keeping, advertising, promotions, aircraft maintenance, and labor relations. USAir would operate the Shuttle under the name "USAir Shuttle." Shuttle would continue to operate as a separate airline under its own operating certificates issued by the Department of Transportation ("DOT") and the Federal Aviation Administration ("FAA") to allow the airline to be sold if USAir decided not to exercise its option to buy the Shuttle. On April 7, 1992, Trump Shuttle merged into a newly created corporation, Shuttle, Inc., which became the corporate successor of Trump Shuttle. On April 12, 1992, the USAir management agreement closing occurred.

The DOT and FAA certificates required the Shuttle to maintain responsibility for its own flight operations (including pilots and flight attendants), but did not require Shuttle and USAir to separate the ground service employees. USAir planned to maintain separate groups of flight personnel but to integrate the ground service employees of USAir and Shuttle, including the fleet service workers, and treat them as a single workforce. IAM had demanded that USAir agree to integrate the ground service employees before IAM would approve the USAir management agreement. Without the approval of IAM, it appears that USAir could not have entered into the management agreement. The large group of fleet service workers at USAir (there were more than 8,000 USAir fleet service workers and 135 Shuttle fleet service workers) was not represented by a union.

In order to integrate the two groups of employees, USAir, IAM, and Shuttle had to resolve numerous issues, including union representation. USAir and IAM agreed to re-solve representation questions by requesting the National Mediation Board ("NMB") to issue a ruling that, for purposes of representation under the Railway Labor Act ("RLA"), USAir and Shuttle were a "single carrier." On April 2, 1992, USAir filed a petition with the NMB seeking single carrier status. On May 12, 1992, IAM joined USAir's petition.

Both the United Steelworkers of America and IAM petitioned to represent the fleet service workers. On August 10, 1992, the NMB ruled that USAir and Shuttle constituted a single carrier for purposes of union representation, and an election was held to decide which union, if any, would represent the combined group of fleet service workers. When the votes were counted, the NMB announced that less than a majority of the fleet service workers had voted for union representation. Accordingly, the result of the election was that the combined group of fleet service workers would not be represented by a union.

After the election, the fleet service workers at Shuttle were no longer treated as if they were represented by a union. Union dues were no longer deducted from their paychecks after the election. The IAM notified plaintiffs by letter dated August 31, 1992, that they were no longer represented by the union. Eventually, the Shuttle fleet service was not integrated with USAir, in part because of difficulties resolving seniority disputes.

In March 1993, after the NMB certified the election result, Shuttle changed several conditions of plaintiffs' employment, including extending the work hours and limiting overtime pay. Also in March 1993, Shuttle furloughed thirty individuals in the fleet service group—twenty-two at LaGuardia, five at Logan, and three at National. Ten of those individuals are plaintiffs here. The decision to furlough those fleet service workers was made by Terry V. Hallcom, President and CEO of Shuttle, based on his conclusions that he could cut costs and replace substandard work by using an outside contractor. Shuttle contracted with Hudson General Corporation to perform the work. In November 1993, eighty-eight individuals in the fleet service group were furloughed or elected volun-

tary retirement in lieu of furlough—forty-three at LaGuardia, twenty-four at Logan, and twenty-one at National. Seventy-three of those individuals are plaintiffs here.[2] At that time, Shuttle subcontracted all fleet service work to Hudson General. Hallcom reached the decision to subcontract the remaining fleet service workers after determining that approximately $2 million a year could be saved by subcontracting the work. Shuttle had no control over the selection of employees by Hudson General.

Furloughing the fleet service workers was part of Shuttle's cost cutting strategy in its attempt to make the airline profitable and recover Trump's debt. From April 12, 1992, to August 31, 1995, the total number of Shuttle employees was reduced from 972 to 553.

### Discussion

There are eighteen counts in plaintiffs' complaint. Plaintiffs bring their federal statutory claims pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 (1994), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34 (1994), the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101–09 (1994), and the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–88 (1994). Plaintiffs also bring state law claims against all defendants and a claim against the IAM for breach of the duty of fair representation. The Court will first address the claims against USAir and Shuttle (parts I–VI, below), and will then address the remaining defendants separately (parts VII–VIII, below).

### I. ERISA, 29 U.S.C. §§ 1001–1461 (1994), Counts 9–13

Section 510 of ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with the employee's pension rights. 29 U.S.C. § 1140 (1994). Plaintiffs claim that defendants violated ERISA when defendants furloughed plaintiffs without allowing them

to work up to age sixty-five (Count 9); when USAir did not offer plaintiffs the same benefits it offered to non-Shuttle employees (Count 10); when defendants furloughed plaintiffs because defendants did not want to pay for greater health care benefits as plaintiffs got older (Count 11); when defendants furloughed plaintiffs because they did not want to assume the increasingly greater risk that plaintiffs would suffer a long term disability (Count 12); and when defendants furloughed plaintiffs to keep plaintiffs from accruing further benefits under the 401(k) retirement plan (Count 13).

This Circuit has recently noted that a "corporate organization change," such as the decision to sell a subsidiary, is generally not the type of action that is prohibited by ERISA. *Andes v. Ford Motor Co.,* 70 F.3d 1332, 1336 (D.C.Cir.1995). Because plaintiffs were furloughed as part of a reduction in force, and the entire fleet service group was eliminated and replaced with an outside contractor, the Court considers their furloughs to be a "corporate organizational change." Accordingly, plaintiffs must show specific evidence of unlawful motivation in order to avoid having summary judgment entered against them.

 Even if the furloughs are not considered a corporate organizational · change, but are to be treated as the discharges of individual employees, plaintiffs must still pass a high hurdle to prove that this case should go to trial. Using the classic *Burdine* framework, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Court must determine if plaintiffs have established a *prima facie* case: (1) prohibited employer conduct; (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. *Berger v. Edgewater Steel Co.,* 911 F.2d 911, 922 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). If plaintiffs establish a *prima facie* case, then defendants must articulate a legitimate, non-discriminatory reason for their actions. If defendants meet that burden, then plaintiffs

---

**2.** The remaining three plaintiffs were furloughed on the following dates: John P. Luti (Logan)—September 22, 1992; Harold Young (Logan)— September 22, 1992; and Lance J. Riddick (LaGuardia)—July 3, 1993.

must prove that the proffered reason is pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Defendants have presented evidence showing that the motivation behind the furloughs and outsourcing of the fleet service work was to save money. Hallcom Aff. ¶¶ 16–22. In his affidavit, Terry Hallcom stated that Trump Shuttle never made a profit and by early 1990 was in dire financial straits because of the large debt incurred to purchase and upgrade the Shuttle. Hallcom Aff. ¶ 7. By late September 1991, Trump Shuttle was nearly unable to generate sufficient revenues to pay its operating costs. Hallcom Aff. ¶ 9. After the banks took over and USAir entered the management agreement, the Shuttle began to cut costs and improve operations to enable it to become economically self-sustaining. Hallcom Aff. ¶ 9. In 1992, the Shuttle increased its cost cutting measures, including job force reductions in all classifications—management, pilots, fleet service, mechanics, and flight attendants. Hallcom Aff. ¶ 16. From April 12, 1992, to August 31, 1995, Shuttle reduced its number of employees from 972 to 553, as well as reducing the number of aircraft and backup flight management, renegotiating vendor and service contracts, and changing operations and maintenance procedures. *Id.* In March 1993, Shuttle outsourced the overnight cleaning workers in order to cut costs and get higher quality service. Hallcom Aff. ¶¶ 18–20. Pleased with the savings in money and the improvement in services, Hallcom decided to outsource the remaining fleet service work to Hudson General for a cost that was 50% less than the Shuttle's existing cost for the work. Hallcom Aff. ¶ 22. According to Hallcom, since 1992 the Shuttle has saved more than $21 million a year as a result of these cost cutting measures, which equals a 25% reduction in total operating expenses. Hallcom Aff. ¶ 25. In 1989, the Shuttle lost over $66 million; in 1994, the Shuttle generated a small profit and is presently an economically self-sustaining business. *Id.* Hallcom states, "Shuttle's reason for discharging Plaintiffs was economic necessity. The furloughs were effectuated by a company in financial distress and were but one part of a massive cost reduction program applied to every facet of the Shuttle's operation in an attempt to reduce costs sufficiently to allow the Shuttle to survive." Hallcom Aff. ¶ 26. Because the decision to furlough plaintiffs was motivated by the desire to cut costs and save the airline, defendants claim that there was no unlawful intent to deprive plaintiffs of pension benefits.

In response to defendants' evidence that the motivation for the furloughs was to cut costs, plaintiffs complain about documents they allegedly did not receive in discovery. Plaintiffs claim, without any citations to the record, that they did not receive notice of changes to the pension plan in 1991 and that such changes were not reported to the Department of Labor. Plaintiffs testified in their depositions that Gordon Linkon and Terry Hallcom of Shuttle, as well as plaintiffs' manager Joita McGlynn, told them that no changes would be made when USAir first took over the management of the Shuttle. Pls.' Exs. 45–49. Plaintiffs also testified that representatives of USAir stated that Shuttle fleet service workers would be integrated with USAir fleet service workers with their full seniority. Pls.' Exs. 52–53, 55, 59. Plaintiffs submit a memorandum from Hallcom to "All Employees," dated March 6, 1992, (five months before the combined fleet service workers voted against union representation) stating that "[e]ffective day one [of USAir's management of Shuttle] there will be *no changes.* Any changes that may occur will be done systematically as we begin to get established as the USAir Shuttle." Pls.' Ex. 69. Plaintiffs submit evidence that the Shuttle's pensions generally were "underfunded" based on actuarial calculations of projected benefits versus projected assets. Pls.' Exs. 70–72.

Plaintiffs also cite to the affidavit and deposition testimony of E. Patricia Evers, former Director of Administration at the Shuttle. Evers testified that Hallcom referred to the Shuttle work force as an "old and aging work force." Evers Dep. at 195. She testified that Hallcom talked with her about the cost of the pension plan and was concerned

that the annual contributions Shuttle had to make to the plan based on the actuarial tables was too high. *Id.* at 159–60; 171. She testified that Hallcom was concerned about the amount of money Shuttle had to pay to the pension plan for the time that employees had worked at Eastern Airlines. *Id.* at 173–74. She testified that, prior to the decision to furlough the fleet service workers, Hallcom instructed the Shuttle's actuaries to compute the cost savings to the Shuttle under different scenarios of the fleet service workers' pension plan, such as if the plan were "frozen." *Id.* at 186–94. She also testified that she was not involved in the decision to furlough plaintiffs and did not discuss the decision with Hallcom, who made the decision. Evers Dep. at 79, 153–59. Hallcom did not tell her why the fleet service workers were furloughed.

In response to Shuttle's interrogatory, "Do you believe that Shuttle ever acted with a motive to deprive you of any retirement, health or other benefit associated with your employment? If so, identify every statement, fact or document that supports your belief," every plaintiff uniformly answered, *inter alia,* "a 'USAir Shuttle spokesman' advised People Magazine, that I was laid off because the Shuttle wanted 'an optimized cost-efficient operation'," and "President Hallcom advised People Magazine that I was laid off because 'the Shuttle management needed to cut jobs to cut costs'," and "President Hallcom informed Crain's New York Business in January 1994, that since November 1993 Shuttle has been paying off interest and principal on its outstanding debt to Citicorp and Citibank. The cost 'savings' that allowed Shuttle Inc. to pay the bank resulted from my layoff." Pls.' Answers to Interrog. 10. Plaintiffs also testified in their depositions that they believed they were furloughed to cut the costs of their salaries, benefits, health plans, and pension plans. *See, e.g.,* DiSpigno Dep. at 105.

Under *Andes v. Ford Motor Co.,* 70 F.3d 1332, 1338 (D.C.Cir.1995), in a case like this one, "the plaintiffs can satisfy § 510 only by showing that some ERISA-related characteristic special to the unit (such as its having a clearly above-average proportion of employees with pension rights about to vest) was essential to the firm's selecting the unit for closure or sale." The evidence shows that Shuttle was in dire financial straits and, since 1992, has undergone dramatic cost cutting measures, including reducing its number of employees by 419 persons—over 40% of the workforce. It is hard to imagine, and plaintiffs have failed to show, that defendants targeted these eighty-six persons to furlough because of their pension costs. The problems that Shuttle was facing were much larger than plaintiffs' pension costs—for example, the fact that Shuttle lost over $66 million in 1989 and still had tremendous debts to repay. Although the fleet service workers were an "aging" group of employees and Hallcom was concerned about the cost of the contributions that Shuttle was making to their pensions, such evidence is not enough to show a specific discriminatory intent. Plaintiffs must show more than that Shuttle furloughed plaintiffs to save money. As the Fourth Circuit explained:

> [Plaintiff] tries to save his claim by citing statements that [defendant] sought to meet its "financial need" by terminating him, and that financial need necessarily includes pension costs. [Plaintiff's] suggestion that [defendant] acted illegally because it acted to save money proves too much. Under that reasoning, any actions by an employer that result in savings would be suspect. It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext.

*Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 239 (4th Cir.1991).

With respect to plaintiffs' furloughs, the undisputed evidence shows that Shuttle furloughed plaintiffs in order to cut costs and save the company. Plaintiffs have presented no evidence to show that Shuttle was motivated by any other factor. Because plaintiffs cannot show a specific intent to discriminate, they have failed to establish a *prima facie* case. Even if they had established a *prima*

*facie* case, their claim would fail because they did not show that Shuttle's legitimate, non-discriminatory reason for the furloughs was a pretext.

With respect to plaintiffs' claims that USAir did not offer plaintiffs the same benefits as non-Shuttle USAir employees, the Court notes that the planned integration of Shuttle fleet service workers into the USAir work force never took place. According to Hallcom, the integration plans failed because of the difficulties encountered by the IAM in resolving an intra-union dispute from attempting to combine the senior Shuttle mechanics into the resistant USAir mechanic work force and the parallel issue presented by the fleet service integration. Hallcom Aff. ¶ 14. Simply because defendants intended to integrate the workers, and the integration plans failed, does not give rise to a claim under ERISA. Plaintiffs have no claims to USAir pension benefits because they were never members of a USAir pension plan.

With respect to plaintiffs' factually unsupported claims that Shuttle violated ERISA by failing to disclose certain pension plans to plaintiffs and the Department of Labor, plaintiffs cite *Varity Corp. v. Howe*, —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). *Varity* does not apply to the present case, however, because *Varity* was not an ERISA § 510 case and all five ERISA counts in plaintiffs' complaint come under § 510. Because plaintiffs have failed to provide any evidentiary support for this claim, and have not brought a count in their second amended complaint alleging any failure of Shuttle to disclose the pension plan to plaintiffs or the Department of Labor, the Court will reject these claims. The Court will grant the motions of USAir and Shuttle for summary judgment on the ERISA counts.

## II. ADEA, 29 U.S.C. §§ 621–34 (1994), Counts 16, 17, 18

The Court of Appeals for this Circuit has stated:

> To make out a prima facie case of age discrimination ... a plaintiff must demonstrate facts sufficient to create a reason-

able inference that age discrimination was "a determining factor" in the employment decision. Such an inference is created if the plaintiff shows that he (1) belongs to the statutorily protected age group (40–70), (2) was qualified for the position, (3) was not hired, and (4) was disadvantaged in favor of a younger person. Once a prima facie case has been established, the employer has the burden of producing evidence tending to show that the applicant was denied employment for a legitimate, nondiscriminatory reason. If the employer does so, and if his evidence is credible, the plaintiff must show by a preponderance of the evidence that the employer's asserted legitimate reason is merely pretextual.... The plaintiff, who at all times retains the burden of persuasion, must then show by a preponderance of the evidence that age was "a determining factor" in the employer's decision.

*Cuddy v. Carmen*, 694 F.2d 853, 856–58 (D.C.Cir.1982) (citations omitted). The Supreme Court has clarified that there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Plaintiffs must show that age was a factor in the decision to furlough them. The *Burdine* framework discussed above applies to ADEA cases.

■ Some of the plaintiffs were not forty years old at the time of the furloughs. The ADEA provides that one must be at least forty years old to bring an ADEA claim. 29 U.S.C. § 631(a); *see also O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (noting that the ADEA "limits the protected class to those who are 40 or older"). Plaintiffs contend that employees who were not yet forty years old when they were furloughed should be allowed to maintain ADEA claims because they were associated with the aging group. Plaintiffs have absolutely no legal support for this assertion. The Court rejects their attempt to bring ADEA claims for employees who were under forty years of age and will grant defendants' motion to dismiss their claims for failure to

meet the first element of the *prima facie* case.

■ With respect to the plaintiffs who were at least forty years old at the time of the furloughs, their highest hurdle in the *prima facie* case is showing that younger persons were treated more favorably than they were. Plaintiffs argue that the average age of Hudson General's employees is younger than the average age of Shuttle's furloughed fleet service group. The defendants, however, had no role in deciding who Hudson General would hire as its employees. Because defendants had no control over the selection of Hudson General's employees, the average age of Hudson General's employees is irrelevant to this case. Plaintiffs have failed to show that defendants treated younger persons more favorably than plaintiffs. The Court will grant defendants' motion to dismiss their claims for failure to meet the fourth element of the *prima facie* case.

Even if plaintiffs did establish a *prima facie* case of age discrimination, they would still lose their claims at the summary judgment level. Defendants have produced evidence showing that plaintiffs were furloughed for a legitimate, nondiscriminatory reason—to save money by outsourcing the entire department. Plaintiffs must show by a preponderance of the evidence that the defendants' asserted legitimate reason is merely pretextual and that age was "a determining factor" in their furloughs.

Plaintiffs rely on the following evidence to show unlawful motivation: (1) the affidavit and deposition testimony of E. Patricia Evers; (2) statistics showing that the majority of the plaintiffs laid off were over the age of forty; and (3) six documents:

(a) a memorandum labeled at the top "Shuttle, Inc. Corporate Objectives 1992," that includes an objective to reduce costs by developing meaningful early retirement opportunities. Pls.' Ex. 17;

(b) A letter from Joseph P. Martinico on USAir Shuttle stationery, dated June 5, 1992, to Thomas Reinert at Morgan, Lewis & Bockius, stating in its entirety, "Dear Tom: As discussed, enclosed please find both a set of mailing labels and a listing of the USAir Shuttle Fleet Service employees. If there is anything else I can do to assist you, please call me at [phone number]." Pls.' Ex. 18;

(c) A newspaper article from the *Washington Times*, dated November 13, 1993, in which the author wrote that Shuttle President Terry Hallcom "said the shuttle is essentially a 5–year–old company that has employees with 25–year–old seniority." Pls.' Ex. 19;

(d) A memorandum from Terry Hallcom, dated November 5, 1993, to workers at the Shuttle regarding early retirement, in which Hallcom announced that retirement eligible employees had the option of selecting either an early retirement package or the resignation offer, Pls.' Ex. 20;

(e) An undated, unsigned document titled "Number of Employees Reaching 'Normal' Retirement Age," listing the number of mechanics and the number of fleet service workers who presumably would reach retirement age in the years 1991–2001, Pls.' Ex. 21; and

(f) A memorandum from Terry Hallcom, dated July 30, 1992, to "All Pilots," regarding the company's policies with respect to pilots over the age of sixty.

■ The Court cannot discern unlawful motivation in the evidence submitted by plaintiffs. E. Patricia Evers testified that she was not involved in the decision and that Hallcom, who was involved in the decision to furlough the fleet service workers, did not tell her why they were furloughed. Evers Dep. at 158–59. She stated that she "wasn't privy" to Hallcom's plans to re-engineer the Shuttle, but that she would see things if they were left in the copying machine sometimes. Evers Dep. at 152. Although she stated that Hallcom used the phrase "old and aging workforce," Evers Dep. at 195–96, Evers could not testify if age was a factor in the decision to furlough plaintiffs because she was not involved in the decision. Evers's testimony, at most, shows that Hallcom knew the ages of the workers and how much it cost Shuttle to keep them employed. Such evidence does not show unlawful motivation. The remainder of plaintiffs' evidence likewise

fails to show discriminatory intent in the decision to furlough the fleet service workers. The Court concludes that plaintiffs have failed to create a genuine issue as to whether their furloughs were more probably than not due to age discrimination. The Court will grant the motions of USAir and Shuttle for summary judgment on the ADEA claims.

### III. WARN, 29 U.S.C. §§ 2101–09 (1994), Count 14

Plaintiffs claim that defendants violated the Worker Adjustment and Retraining Notification Act ("WARN") because defendants failed to give plaintiffs sixty days advance notice before furloughing plaintiffs and failed to offer plaintiffs an opportunity to retrain. Plaintiffs also allege that they were denied their WARN rights because of their union activities.

Defendants argue that plaintiffs do not have a claim under WARN because the termination of their employment did not constitute a "plant closing" or a "mass layoff" as defined by the statute. Under the WARN Act, plaintiffs must show that there was a reduction in force "of one or more facilities or operating units within a single site of employment" which, during a thirty day period, terminated the employment of at least thirty-three percent of the employees *and* at least fifty employees. 29 U.S.C. § 2101(a) (1994).

█ The reduction in force took place at three different locations—Washington National Airport, Boston's Logan Airport, and New York's LaGuardia Airport. Each airport must be considered separately as the three are not a "single site of employment." The only airport that even comes close to having a fifty person layoff is LaGuardia. Plaintiffs claim that forty-four fleet service workers and seventeen "additional" people were laid off at LaGuardia in a thirty day period. These "additional" people were not fleet service workers, but were flight attendants, inside ticket agents, clerks, and a staff accountant.

Defendants claim that forty-three fleet service workers were laid off, and that the "ad-ditional" people were not part of the "operating unit" pursuant to WARN regulations, 20 C.F.R. § 639.3(j). Defendants also claim that the "additional" people were discharged for cause or voluntarily resigned, and thus do not come under the WARN definition of "employment loss," 29 U.S.C. § 2101(a)(6).

The Court agrees that these "additional" people cannot count for the fifty person minimum layoff because they were not part of the fleet service "operating unit," as required by the statute. Moreover, plaintiffs have failed to allege that at least thirty-three percent of the employees at LaGuardia were terminated during the same thirty day period. The Court will grant the motions of USAir and Shuttle for summary judgment on the WARN claim.

### IV. Barone, *et al.*—option for retirement eligible plaintiffs; Cross–Motion of Shuttle

█ Nineteen plaintiffs (Barone *et al.*) were fifty-five years of age or older when they were furloughed. These plaintiffs claim they were eligible to retire on November 1, 1993. They did not retire, and around November 13, 1993, they were furloughed from their fleet service jobs. Shuttle gave these plaintiffs a choice of either a retirement package (enhanced medical benefits, lifetime travel, etc.) or severance pay (15 weeks of pay). Furloughed employees who were under fifty-five years old received just the severance pay. Barone *et al.* claim they were entitled to both the retirement package and the severance pay. These plaintiffs claim that the denial of one of the two options was made in violation of the ADEA. They have filed a motion for summary judgment on this issue.

Shuttle has filed a cross-motion for summary judgment on this issue. Shuttle's main argument is that the Shuttle offered *enhanced* benefit options to these older employees. Twenty-one out of the twenty-two retirement eligible employees took the retirement package, which Shuttle claims was far preferable to the severance pay. Shuttle notes that retirement eligible employees were not denied any benefits offered to other employees, but, on the other hand, were giv-

en the option of taking the same exact thing (furlough and severance pay) or a better option (retirement and benefits). Shuttle cites *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), in which the Supreme Court held that an employer does not violate the ADEA when the factors wholly motivating the employer's action are something other than the employee's age, "even if the motivating factor is correlated with age, as pension status typically is." *Id.* at 611, 113 S.Ct. at 1706. According to defendants, plaintiffs have failed to establish a prima facie case of age discrimination.

The Court concludes that the Barone *et al.* plaintiffs have failed to present evidence creating a genuine issue as to whether Shuttle's treatment of them was more probably than not due to age discrimination. Plaintiffs' only evidence of age discrimination in the retirement option matter is that retirement eligible employees received a choice and younger employees did not. For the reasons set forth above with respect to the ADEA claims of all plaintiffs, and because Barone *et al.* have presented no evidence that they were treated less favorably than younger employees, the Court will deny the motion of Barone *et al.* for summary judgment and grant the cross-motion of Shuttle.

## V. The Validity of the Single Carrier Proceeding

The main issue in USAir's motion for summary judgment and plaintiffs' motion for summary judgment "on the issue of the validity of the single carrier proceeding" is the validity of the National Mediation Board's single carrier proceeding under the Railway Labor Act. Plaintiffs seek a declaration that the proceeding is void and invalid as a matter of law.

Plaintiffs claim that the single carrier proceeding before the NMB was invalid because USAir invoked the jurisdiction of the NMB. A decision in this Circuit, *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655 (D.C.Cir.) (*en banc*), *amended by* 38 F.3d 1224 (1994), *cert. denied,* 514 U.S. 1032, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995),

invalidated the regulations of the NMB that allowed carriers to bring labor dispute claims before the NMB in the event of a merger ("the Merger Regulations"). According to *RLEA v. NMB,* the NMB can hear a claim *only* if it is brought by employees or unions.

The single carrier determination in the present case was brought at the joint request of two unions—the Steelworkers and IAM—and the carrier. On May 12, 1992, the IAM filed a letter with the NMB, stating, "[t]he International Association of Machinists and Aerospace Workers, AFL–CIO, ('IAM') joins with USAir, Inc. ('USAir') in its letter of April 2, 1992, and requests that the Board invoke its *Merger Procedures* and find that USAir and Shuttle, Inc. ('USAir Shuttle') are a single carrier for representational purposes under the Railway Labor Act." 2nd Am. Compl. Ex. 8. In *RLEA v. NMB,* the carrier invoked the NMB's jurisdiction without being joined by any union. The Court concludes that the NMB's single carrier determination was valid because the unions joined the petition to invoke the NMB's jurisdiction. Accordingly, the Court does not have jurisdiction to review the single carrier determination. *Switchmen's Union v. National Mediation Bd.,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943).

The next issue before the Court is whether, despite the loss of union representation, plaintiffs were still protected by their collective bargaining agreement. Plaintiffs argue that they were. USAir argues that, under the RLA, loss of representation *means* loss of the collective bargaining agreement and any obligation to maintain the status quo of the conditions contained in the agreement. This case falls squarely within the reasoning of *International Bhd. of Teamsters v. Texas Int'l Airlines, Inc.,* 717 F.2d 157 (5th Cir. 1983), in which the Court of Appeals for the Fifth Circuit stated:

> Given the Mediation Board's undeniable sole jurisdiction over representation matters, we infer from the practical problems of divided jurisdiction a congressional intention to allow that agency alone to consider the post-merger problems that arise from existing collective bargaining agreements.... After a merger that makes the

employee group hitherto represented by the Union a minority of the craft, the question of employee representation inevitably arises. When this happens, resolution of that question is the function of the National Mediation Board.

*Id.* at 164. According to *Texas Int'l Airlines,* the issue of whether plaintiffs were to be represented by a union was within the exclusive, nonreviewable jurisdiction of the NMB. Although the NMB lacks authority to enforce contracts between carriers and unions, *see Chicago & N.W. Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), the NMB has exclusive authority to govern "representational" disputes, including whether a majority of the employees desire the union's representation and whether two related carriers will be treated as one for representation purposes.

The danger that would arise if the Court were to accept plaintiffs' proposition that their Trump Shuttle–IAM collective bargaining agreement remained in existence after the fleet service group voted against union representation is that the Court would, in effect, recognize the union as the fleet service group's bargaining agent. A collective bargaining agreement "is not merely a contract negotiated by an agent on behalf of a group of principals, thereafter to be performed and enforced entirely by the principals. It recognizes the Union as the employee's bargaining agent. It delegates to the Union the right to enforce its provisions as the agent of the employees. By its terms the agreement is a *collective bargaining agreement* not a series of individual employment contracts. If the employees designate a new collective bargaining representative, it succeeds to the status of the former representative without alteration in the contract terms. [citations] The agreement cannot survive, however, without some bargaining agent." *Id.* at 163–64.

The Court of Appeals for this Circuit has discussed *Texas Int'l Airlines* in several cases, including *Association of Flight Attendants v. Delta Air Lines, Inc.,* 879 F.2d 906, 912–13 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990), and *Association of Flight Attendants v. USAir, Inc.,* 24 F.3d 1432, 1440 (D.C.Cir. 1994). In *Association of Flight Attendants v. United Airlines, Inc.,* 71 F.3d 915, 918 (D.C.Cir.1995), in the context of discussing the *Texas Int'l Airlines* decision, the Court of Appeals noted that, "of course, if the NMB were to subsequently determine that the affected employees fell within a much broader class or craft in which the union did not enjoy majority support, the contractual relationship would necessarily terminate." At least some of the plaintiffs understood that if the combined USAir/Shuttle fleet service group voted against union representation, they would lose their union and their contract:

> Question: What was your concern about no union winning the election?
>
> Answer: Without a union, we have no contract.

DiSpigno Dep. at 186.

The Court concludes that, when plaintiffs were combined with the much larger group of USAir fleet service workers and the combined vote resulted in no union representation, plaintiffs' representation and collective bargaining agreement necessarily terminated. For the reasons set forth above and in the memoranda and argument of USAir, the Court will grant USAir's motion for summary judgment on this issue, which was joined by Shuttle, and deny the motion of plaintiffs.

Plaintiffs also bring an "anti-union animus" claim under the RLA, § 2, Fourth. Section 2, Fourth prohibits carrier interference with employee efforts to organize unions. The leading § 2, Fourth case in this Circuit is *Air Line Pilots Ass'n v. Eastern Air Lines,* 863 F.2d 891 (D.C.Cir.1988), *cert. dismissed,* 501 U.S. 1283, 112 S.Ct. 38, 115 L.Ed.2d 1119 (1991). According to that case, an employer is limited to taking only measures that it would have taken in the absence of any anti-union animus. *Id.* at 902. "[U]nions should not be able to immunize their members from market forces merely by engaging in conduct virtually certain to provoke anti-union feeling." *Id.* at 902. In the present case, plaintiffs cite to a comment made by Terry Hallcom, Shuttle President and a former Eastern

pilot, to plaintiff James May about how Hallcom might still be flying Eastern planes if the union and Eastern had been able to reach a deal. May, who also used to work for Eastern, agreed that Hallcom's statement about the Eastern situation was "quite possibl[y]" true. Plaintiffs also cite to a memorandum written by Hallcom to a labor relations employee at USAir in which Hallcom advocated a hard bargaining position with the unions.

Hallcom's comment about Eastern does not show anti-union animus. His comment also does not show a causal connection between the alleged animus and plaintiffs' furloughs. The memorandum does not show anti-union animus, either. It merely shows Hallcom's position on bargaining with unions. Hard bargaining, by itself, does not show anti-union animus. Defendants have presented ample evidence that plaintiffs were furloughed to save money; plaintiffs have presented no evidence that their furloughs were caused by anti-union animus. Accordingly, the Court will grant summary judgment for defendants on this issue.

## VI. State Law Claims

Plaintiffs bring numerous state law claims. The Court rejects all of plaintiffs' state law claims because such claims are clearly preempted by the Railway Labor Act or ERISA. See 29 U.S.C. § 1144(1) ("the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title"); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

## VII. Motion of IAM

IAM is a defendant in Counts Seven (state law fraud), Fifteen (breach of duty of fair representation), and Sixteen (Age Discrimination in Employment Act). IAM contends that Count Fifteen was filed after the limitation period and must be dismissed as untimely. IAM argues that the state law claim is preempted by the federal claim and must also be dismissed. Finally, IAM claims that

it is entitled to summary judgment on the ADEA claim because there is no evidence that IAM caused or attempted to cause the furloughs.

### A. Breach of Duty of Fair Representation (Count 15)

 Technically, the Railway Labor Act has no "duty of fair representation" provision. In *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 199, 65 S.Ct. 226, 230–31, 89 L.Ed. 173 (1944), however, as part of a series of cases involving alleged racial discrimination by unions, the Supreme Court recognized that the Railway Labor Act imposes a duty on the union to represent all members of the bargaining unit fairly. Under this doctrine, the union has a duty "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967) (*quoted in Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76, 111 S.Ct. 1127, 1134, 113 L.Ed.2d 51 (1991)).

IAM argues that this action must be dismissed against it because plaintiffs filed this complaint outside the six month limitation period. Plaintiffs do not challenge that the appropriate limitation period is six months. That time period comes from *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 155, 103 S.Ct. 2281, 2285–86, 76 L.Ed.2d 476 (1983), in which the Supreme Court borrowed the six month period from § 10(b) of the National Labor Relations Act. The Fourth Circuit applied *DelCostello* to a case under the Railway Labor Act in *Triplett v. Brotherhood of Ry., Airline & S.S. Clerks*, 801 F.2d 700, 702 (4th Cir.1986).

 The limitation period began to run when plaintiffs knew or should have been aware of their injury. IAM argues that the period began to run after the election, when plaintiffs lost their union representation. The undisputed facts show the union had no contact with plaintiffs after August 11, 1992, other than telling plaintiffs that it no longer represented them. Plaintiffs were fur-

loughed in March and November 1993, and filed this lawsuit in May 1994.

Plaintiffs' only argument for tolling the limitation period is that they believed the union would continue to represent them after the vote to reject union representation. Although it was clear that they were no longer represented by a union—IAM sent them a letter telling them it no longer represented them; plaintiffs stopped paying union dues to IAM; plaintiffs applied for withdrawal cards and withdrew from the union, see, e.g., Pls.' Answers to IAM's Interrog. 2—plaintiffs maintain that IAM told them that it would continue to negotiate their integration with USAir regardless of the election results. Plaintiffs claim that it was not until the second group of them was furloughed on November 13, 1993, that they knew, or should have known, that the IAM was not going to negotiate the integration on their behalf. In support of this proposition, plaintiffs cite the following facts:

(1) A letter dated April 23, 1992, from IAM General Vice President John F. Peterpaul, which was posted at plaintiffs' work stations. Peterpaul describes the background of the single carrier proceeding (which had not yet been decided) and then states that "[w]hen the National Mediation Board approves the petition for the single employer, this will then put us in a posture to sit down and negotiate a full integration agreement with USAir containing the necessary wages, hours and working conditions." In the final paragraph, Peterpaul tells the recipient of the letter, "[y]ou should also advise the Shuttle members that, no matter what the final determination of the NMB, because USAir will control the Shuttle operation and USAir is within the jurisdiction of District Lodge 141, in order to better service our members, the Shuttle contract and our members will be transferred into District 141 as soon as it is appropriate." Pls.' Ex. 134.

(2) An undated letter to Lou Schroeder from "A Group of Flying Tiger Members" thanking Schroeder and the rest of IAM District 141 for their help in an arbitration. The Flying Tiger Members also thank IAM for allowing Airline Coordinator Bill Scheri to testify for them. They conclude, "We all hope that when the times and conditions are most appropriate, the IAM will make a strong effort to reorganize FedEx, and bring us under the banner of the IAM." Pls.' Ex. 136.

(3) An undated "Opinion and Award" in Seniority Integration in the matter of the arbitration between Federal Express Corporation, Federal Express Mechanics, and former Flying Tiger Mechanics, Stock Clerks and Related Employees. George Kavros, Assistant General Chairman, IAM District Lodge 141, appeared for the Flying Tiger Line Seniority Committee. The opinion notes the testimony of Bill Scheri.

(4) The deposition testimony of Pierre Schrichte, a former plaintiff in this action who has been voluntarily dismissed, that he believed IAM "would do for us what they did for the brother members at Flying Tiger." Schrichte Dep. at 52.

The Court concludes that this evidence fails to raise a genuine issue of material fact about whether IAM told plaintiffs that it would continue to represent them even after it was voted out. The April 23, 1992, letter does not discuss what IAM would do if it lost the election, and nowhere states that IAM would continue to negotiate for plaintiffs if it were no longer their bargaining representative. The evidence about Flying Tiger and the testimony of a voluntarily dismissed plaintiff that he thought IAM would do for him what it did for Flying Tiger simply does not show that IAM misled plaintiffs into thinking that IAM would continue to negotiate on plaintiffs' behalf after it lost the election. The undisputed evidence shows that plaintiffs knew, shortly after the election, that IAM no longer represented them. Having failed to present any evidence that IAM told plaintiffs it would continue to negotiate on their behalf, the Court finds as a matter of law that plaintiffs' cause of action with respect to IAM accrued as of the date they knew or should have known that they were no longer represented by IAM, August 1992, or, at the very latest, when the first group of plaintiffs was furloughed in March 1993. Plaintiffs did not file this lawsuit until May 9,

1994, well after the six month limitation period. Accordingly, the Court will grant the motion of IAM for summary judgment on Count 15.

### B. State Law Fraud & Deceit (Count 7)

IAM argues that the state claim of fraud and deceit is preempted by the federal duty of fair representation under *Vaca v. Sipes,* 386 U.S. 171, 177 & 188–95, 87 S.Ct. 903, 909–10, 915–19, 17 L.Ed.2d 842 (1967). In a Fourth Circuit case with issues similar to the present case, the Court of Appeals held that the federal duty of fair representation preempts identical state law claims. *See Nellis v. Air Line Pilots Ass'n,* 15 F.3d 50, 51 (4th Cir.), *cert. denied,* 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 14 (1994). At oral argument, when asked to articulate how the state law claim differs from the federal claim, counsel for plaintiffs stated: "Because lying isn't condoned under a collective bargaining agreement. And if you do that, you are subject to state rules concerning it. That's the short answer, Your Honor." Vol. III, Tr. of Mot. Hrg., June 27, 1996, at 86. The Court finds no merit in plaintiffs' argument and agrees with IAM that plaintiffs' state law claim is the same as the federal claim. Accordingly, the state law claim must be dismissed.

### C. Age Discrimination (Count 16)

IAM argues that it is entitled to summary judgment on plaintiffs' age discrimination claim because there is no evidence that the union caused or attempted to cause plaintiffs' furloughs. From August 1992, including through the March and November 1993 furloughs, plaintiffs were not represented by IAM. The ADEA makes it "unlawful for a labor organization ... to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 29 U.S.C. § 623(c). Because there is no evidence of record that IAM had anything to do with plaintiffs' furloughs, the Court will grant IAM's motion for summary judgment on Count 16.

### D. Conspiracy

In its opposition memorandum, plaintiffs appear to bring conspiracy claims against IAM that are not in the complaint. Plaintiffs allege that the union acted against plaintiffs with anti-union animus because IAM thought plaintiffs were "scabs." Section 2, Fourth of the Railway Labor Act, discussed above, applies only to carriers. There is no cause of action for a union that allegedly acted with anti-union animus. The Court also notes that plaintiffs have failed to present any evidence that IAM was part of a conspiracy against plaintiffs.

### VIII. Motion of Citibank and Citicorp

Citicorp is a bank holding company. Citibank is a lender and agent for a consortium of twenty-two financial institutions which lent approximately $380 million to Donald Trump to purchase Shuttle. Citibank is a shareholder of Shuttle. Plaintiffs claim that John S. Reed, the Chief Operating Officer of Citicorp, and Wendy Silverstein, a vice president of Citibank and one of the directors of Shuttle, were personally involved in the decision to furlough plaintiffs.

The record overwhelmingly shows that Citicorp and Citibank had no involvement in plaintiffs' furloughs. Plaintiffs' vast conspiracy theory has failed to materialize after discovery. *See* Vol. III, Tr. of Mot. Hrg., June 27, 1996, at 4–46. Although Citibank was actively involved in restructuring Trump's loan and creating Shuttle, Inc. in an attempt to recover some of the money lent to Trump, it is clear that Citibank and Citicorp had no role in managing the operations of the Shuttle. The evidence shows that Citicorp and Citibank are not "carriers" under the RLA, had no involvement in petitioning the NMB for the single carrier determination, were not plaintiffs' "employer," had no involvement in plaintiffs' employee benefit plan, and had no involvement in the decision to furlough plaintiffs. Because plaintiffs have failed to raise any genuine issue of material fact for trial with respect to Citicorp and Citibank's involvement in their employment or their furloughs, the Court will grant the motion of Citicorp and Citibank for summary judgment on all counts.

### Conclusion

For the reasons set forth above, the Court will grant the motions for summary judgment of all defendants and deny the motions of plaintiffs. An appropriate Order will issue.

/s/ Norma Holloway Johnson

United States District Judge